In the Matter of Paul E. THOMAS, Charlene S. Thomas d/b/a Thomas Landscaping Company, Thomas Landscaping Company, Inc., Debtors.

**JOSEPH LORENZ, INC., Plaintiff,**

v.

**Paul E. THOMAS, Charlene S. Thomas, d/b/a Thomas Landscaping Company, Thomas Landscaping Company, Inc., Defendants.**

Bankruptcy No. 81–01379.
Adv. No. 81–0753.

United States Bankruptcy Court,
E. D. Wisconsin.

June 30, 1982.

John T. McCann, Milwaukee, Wis., for plaintiff.

Richard H. Bussler, Jr., Milwaukee, Wis., for defendants.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

Plaintiff ("Lorenz") commenced an action to declare its claim against debtors-defendants ("Thomas Landscaping") as non-dischargeable pursuant to § 523(a)(4) of the Bankruptcy Code (defalcation while acting in a fiduciary capacity) and, alternatively, pursuant to § 523(a)(6) of the Bankruptcy Code (malicious injury to property).[1]

Lorenz was a general contractor on a City of Milwaukee public improvement commonly referred to as the "Green Market Project". Thomas Landscaping was a subcontractor for Lorenz on this particular job and was, pursuant to a contract dated April 2, 1980 and thereafter modified on December 16, 1980, to furnish material and labor for landscaping, including the installation of trees, at a total subcontracting price of $24,700.00. During the course of work on this project but prior to completion, Lorenz issued three separate checks to Thomas Landscaping in partial payment totalling $22,730.00 which were paid as follows:

---

1. Because § 523(a)(4) fully disposes of this case, there will be no discussion regarding § 523(a)(6).

| DATE | TO WHOM | AMOUNT PAID |
|---|---|---|
| December 23, 1980 | Thomas Landscaping and Pioneer Turf Nursery | $ 4,925.46 |
| December 23, 1980 | Thomas Landscaping | 15,774.54 |
| January 6, 1981 | Thomas Landscaping | 2,030.00 |
| | TOTAL | $22,730.00 |

The first check for $4,925.46 was endorsed by Thomas Landscaping and turned over to Pioneer Turf Nursery, one of its suppliers on the Green Market Project, as replacement for a previously issued "non-sufficient funds" check. The second check was deposited in a checking account in the name of "Charlene Thomas" at the First Wisconsin-Milwaukee Bank, and the third check was deposited in a savings account in the names of "Paul E. Thomas or Charlene Thomas" at Mutual Savings and Loan Association.

Paul Thomas testified that the deposits were made in this fashion because the business accounts of Thomas Landscaping had been closed out, due to a series of overdrafts.

Lorenz alleges that most, if not all, of the funds from the $15,774.54 and $2,030.00 checks were used for the payment of personal expenses of defendants Paul and Charlene Thomas or for the general business expenses of Thomas Landscaping and were in no manner related to or used for the Green Market Project.

A trial was conducted before this Court on June 8, 1982. Prior to the commencement of the trial, the parties filed a joint final pre-trial report in which certain facts were stipulated to and made a part of the record.

## ISSUES INVOLVED

Four separate issues must be resolved in order to fully dispose of this case. They are as follows:

1. Was the role of Charlene Thomas in Thomas Landscaping so limited as to preclude Lorenz' claim of non-dischargeability against her?

2. Is Wis.Stats. 779.16 (theft by contractor) applicable so as to make defendant Paul Thomas a "fiduciary" within the meaning of 11 U.S.C. § 523(a)(4)?

3. If the answer to "2." is in the affirmative, does the evidence establish a claim of defalcation against Paul Thomas while acting in a fiduciary capacity?

4. If the answer to both "2." and "3." are in the affirmative, what is the appropriate measure of the non-dischargeable damages?

## CLAIM AGAINST CHARLENE THOMAS

At the conclusion of plaintiff's case, counsel for Thomas Landscaping moved to dismiss as against defendant Charlene Thomas ("Charlene"), and a ruling on this motion was reserved pending the taking of all testimony.

The Court is now satisfied by the testimony that Charlene was little more than a disbursing agent who acted at the behest and direction of her husband, defendant Paul Thomas ("Paul"). She did not receive any salary and, in fact, during the particular time in question, held a full-time job as an assembler in a company having no connection with her husband's work. She did not know where the funds which she deposited came from and was not familiar with the Green Market Project. She never answered business telephone calls, did not keep the books and records, did not send out any business billings and had no role in the hiring or firing of employees. She did not invest any funds in the business, either in the form of loans or by capital contributions. It is true that there were plans in process to incorporate Thomas Landscaping in which Charlene and Paul each would have become 50 per cent stockholders. The business, however, was never incorporated. The parties stipulated that it was Paul and not Charlene who ran the day to day affairs of the business, although Charlene did have some involvement in depositing of funds received by the business and in paying business bills. Notwithstanding Charlene's involvement, this Court is persuaded that her role in the business was minimal. Although

it is true that Charlene may have been involved to some extent in depositing funds and in issuing checks and may have even issued some checks for household purposes without her husband's specific instructions, nevertheless, these factors did not subject her to the exceptions to discharge provisions under § 523. In view of the well known purposes of the bankruptcy law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed therein. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). Moreover, the burden of proving that a debt comes within one of the statutory exceptions is upon the party opposing the discharge of the debt. *Danns v. Household Finance Corp.*, 558 F.2d 114 (2d Cir. 1977). This burden was not met with respect to Charlene.

### WAS DEFENDANT PAUL THOMAS ("PAUL") A "FIDUCIARY"?

§ 523(a)(4) of the Bankruptcy Code provides:

"A discharge under § 727—of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity—"

■ For a debt to be non-dischargeable under this section, the prerequisite fiduciary relationship must rest upon a technical or express trust and not upon a trust implied in law resulting from an act of wrong doing. Further, the fiduciary relationship must be shown to have been in existence prior to the creation of the debt in controversy. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Courts often look to state law in order to determine when a fiduciary relationship exists for purposes of dischargeability. 1 *Norton Bankr. L. and Prac.*, § 27.23 (1981).

In the case at bar, it is for this Court to determine:

1. If Paul was a "fiduciary" by virtue of Wis.Stats. 779.16; and

2. If so, when he assumed his fiduciary obligations—*i.e.*, was it when Paul received payment from Lorenz or when the funds were diverted from Paul's suppliers and utilized for other purposes.

If this Court concludes that there was never any fiduciary relationship or that it arose only by virtue of an act of wrong doing, then it must necessarily follow that what was created was a trust implied in law and not an express trust. Section 523(a)(4) would under these circumstances become inapplicable and Paul's debt to Lorenz would be dischargeable.

■ The settled law followed by bankruptcy courts in Wisconsin is that a misapplication of funds by a contractor or subcontractor amounts to misappropriation of funds while acting in a fiduciary capacity within the meaning and intent of § 523(a)(4) of the Code (formerly § 17(a)(4) of the Act).[2] This Court, in accordance with this historical precedence, holds that Paul was a fiduciary within the meaning and intent of § 523(a)(4). Wis.Stats. 779.-16[3] clearly proclaims that any funds paid to a contractor or sub-contractor for public

---

2. *Bastian v. LeRoy*, 20 Wis.2d 470, 122 N.W.2d 386 (1962); *In re Frasier*, No. 72–BK–74 (W.D. Wis., August 7, 1972); *In re Mack*, No. 72–B– 1303 (E.D.Wis., March 29, 1974); *In re Schultz*, No. 74–1469 (E.D.Wis., March 24, 1975); *In re Wolter*, No. 77–B–501 (E.D.Wis., August 23, 1979); *In re Olson*, No. 79–108 (E.D.Wis., March 26, 1980).

3. "779.16 *Theft by Contractors.* All moneys, bonds or warrants paid or to become due to any prime contractor or subcontractor for public improvements are a trust fund only in the hands of the prime contractor or subcontractor and shall not be a trust fund in the hands of any other person. The use of the moneys paid to the prime contractor or subcontractor for any purpose other than the payment of claims on such public improvement, before the claims have been satisfied, constitutes theft by the prime contractor or subcontractor and is punishable under s. 943.20. This section shall not create a civil cause of action against any person other than the prime contractor or subcontractor to whom such moneys are paid or become due. Until all claims are paid in full, have matured by notice and filing or have expired, such money, bonds and warrants shall not be subject to garnishment, execution, levy or attachment."

improvements on a pending project or a project which is later commenced, are "a trust fund," and payment to the contractor or sub-contractor creates an express trust. The lack of any requirements within § 779.-16 for a trustee to segregate trust funds does not alter this result. If a trustee commingles funds, such trust may be enforced against any part of the commingled trust funds which are able to be traced but the trust is not invalidated. *Simonson v. McInvaille*, 42 Wis.2d 346, 166 N.W.2d 155 (1969).

This Court is cognizant of a recent decision rendered by its colleague, Judge Ihlenfeldt, in the case of *In re Lotto*, 81–944 (E.D.Wis. June 28, 1982). It believes that both cases are consistent, and employ the same underlying rationale, notwithstanding opposite results. As Judge Ihlenfeldt pointed out in the *Lotto* case:

"While the (Wisconsin) cases—indicate that the Wisconsin statute creates the type of fiduciary relationship contemplated by section 523(a)(4) of the Code, the (*Lotto*) case presents an important factual distinction. Whereas all of the foregoing cases involved claims of unpaid subcontractors and materialmen or of others who were subrogated to such claims, in this case the only work or material furnished has either been paid for by Lotto or was supplied by Lotto himself. Thus there are no unpaid sub-contractors or materialmen, and there will be none."

The facts in the case at bar, unlike *Lotto*, are similar to those cases Judge Ihlenfeldt referred to and involves a party (Lorenz) as subrogee of the claims of unpaid suppliers.

A comparison with corresponding statutes in other jurisdictions reveals this to be an area replete with much confusion and conflict. Some statutes contain provisions omitting any specific language of a "trust fund", resulting in the Courts therein holding that no express trust was created. *In re Dloogoff*, 600 F.2d 166 (8th Cir. 1979); *In re Angelle*, 610 F.2d 1335 (5th Cir. 1980). In New Mexico, the statute does not employ the words "trust fund", or similar words; nevertheless the Court ruled an express

trust was created. *In re Romero*, 535 F.2d 618 (10th Cir. 1976). In other jurisdictions where "trust fund" appears specifically in the statute, Courts have decided that the clear intention was to impose an express trust. *Carey Lumber v. Bell*, 615 F.2d 370 (5th Cir. 1980); *In re Kawczynski*, 442 F.Supp. 413 (W.D.N.Y.1977). Michigan, however, notwithstanding the fact that its statute employs the words "trust fund", has concluded that these words in and of themselves do not result in an express trust. *In re Johnson*, 23 C.B.C. 80 (Bkrtcy.,W.D.Mich. 1980); *aff'd.* 10 B.R. 322 (W.D.Mich., 1981).

Paul's counsel urges this Court to adopt the Michigan view. In the *Johnson* case, the bankruptcy court held that the Michigan Builders Trust Fund Act did not in itself cause the debtor-contractor to be acting in a fiduciary capacity. The District Court affirmed this ruling on other grounds and did not address itself to the issue of whether or not the debtor-contractor was acting in a fiduciary capacity. Instead, the District Judge stated that in order for the creditor to prevail in his effort to have the debt ruled nondischargeable under § 17(a)(4) of the Act (now § 523(a)(4) of the Code), it was required to prove "intent to defraud" which is a requirement of the Michigan statute and, in this respect, the creditor failed to sustain its burden of proof.

After analyzing these Michigan decisions, this Court declines to adopt that result. It may be true, as the Michigan District Judge stated, that in order for a violation of the Michigan statute to exist, "intent to defraud" is required to be proven. However, so long as the existence of a fiduciary capacity and breach of the fiduciary obligations thereunder are proven, it seems to this Court that this would have been sufficient to bring the debtor-contractor within the purview of the discharge provisions of the Bankruptcy Code. This conclusion is not changed by the fact that there may have been no violation of the Michigan Act for failure to prove "intent to defraud". Section 523(a)(4) uses the words "fraud *or defalcation.*" Defalcation is apparently a

broader term than fraud. 2 *Collier Bankruptcy Manual*, § 523.05 (3d. Ed. 1979). The Court's rationale that the underlying purpose of the Bankruptcy Code is to give the debtor a "fresh start" and therefore to declare the debtor-contractor a fiduciary under the Michigan statute would frustrate this policy, fails to fully recognize the discharge provisions. Section 523 succinctly spells out that "defalcation while acting in a fiduciary capacity" is a stated exception to discharge, notwithstanding the Code's "fresh start" policy.[4]

In *Carey Lumber Co. v. Bell, supra,* the Fifth Circuit construing Oklahoma lien trust statute determined that funds given to a debtor-contractor in payment of valid lienable claims were "trust funds" by virtue of clear statutory language, notwithstanding the fact that there was no explicit provision for segregation of funds. In this respect, the Oklahoma statute is similar to that of both Wisconsin and Michigan. The Court in *Carey* stated, 615 F.2d 370, 374:

> "The trust created by the lien trust statute is an express trust. The statutes expressly and clearly impose a trust relationship upon construction mortgagors— The statutes make clear that these funds are to be held in trust even though there may be no beneficiary at the time they are received (the funds are to be held as trust funds for the payment of all valid lienable claims due and owing or *to become due and owing*)." (Emphasis added)

This Court is of the opinion that the Fifth Circuit decision in *Carey* is correct and applicable to the facts in the case before this Court.

■ The Court deems it appropriate to comment upon the propriety of whether Lorenz should be included within the ambit

of the Wisconsin "theft by contractor" statute or whether such protection should be limited to laborers, sub-contractors, and materialmen. In this Court's judgment, Wis. Stats. 779.16 should not be construed so narrowly so as to exclude Lorenz. Lorenz was required to pay Paul's materialmen. It therefore seems equitable to extend to Lorenz, by subrogation, the right to proceed against Paul in the same manner Paul's suppliers would otherwise have been able to so proceed had they not been paid. The intent of the statute is to protect workmen and suppliers who have furnished labor and material as well as owners against irresponsible or underfinanced building contractors diverting funds to unrelated projects or for personal use. This protection should be broad enough to cover parties such as Lorenz who may be required to make these payments for any reason to such workmen and suppliers.[5]

Based upon the foregoing, Paul was acting in a fiduciary capacity within the meaning of § 523(a)(4).

## DID PAUL'S USE OF THE FUNDS CONSTITUTE "DEFALCATION" WITHIN THE MEANING OF § 523(a)(4)?

Having concluded that Paul was a fiduciary, it is now for the Court to determine if his use of these funds amounted to "defalcation."

Paul contends that his debt to Lorenz does not fall within § 523(a)(4). At the very worst, he states his actions amounted to a high degree of negligence, not intentional malfeasance.

■ Defalcation is broader than embezzlement and probably broader than misappropriation. In *Central Hanover Bank & Trust Co. v. Herbst,* (CCA 2d, Cir. 1937), 35 Am.B.R. (N.S.) 318, 93 F.2d 510), Judge Learned Hand stated as follows:

> the benefit of the surety as subrogated to the rights of the materialmen. *Accord, Cagle, Inc. v. Sammons,* 254 N.W.2d 398, 198 Neb. 595 (1977). If a general contractor makes payments to persons who supplied labor or materials to sub-contractor and such payments were for protection of its own rights or interest, such general contractor is entitled to subrogation.

---

**4.** *See, In re Kawczynski,* 442 F.Supp. 413 (W.D. N.Y.1977) where the New York court also takes issue with the Michigan view and concludes that the Michigan court's reasoning was not based upon statutory construction, but upon policy considerations.

**5.** *U. S. Fidelity and Guar. Co. v. Sidwell,* 525 F.2d 472 (C.A.Okl.1975). Claims of materialmen who were paid by a surety were held for

"Colloquially perhaps the word 'defalcation' ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts—all we decide is when a fiduciary takes money upon a conditional authority which may be invoked and knows at the time it may, he is guilty of a 'defalcation' though it may not be a 'fraud' or 'embezzlement' or perhaps not even a 'misappropriation' ".

■ From the testimony, it is clear that Paul was well aware of the consequences to Lorenz if Paul's suppliers were not paid on the Green Market Project. He testified that he knew, in case his suppliers were not fully paid, that it would then become Lorenz' obligation to pay them. Nevertheless, he stated it was of no concern to Lorenz or to anyone else what he did with the funds received from Lorenz. He also admitted that none of these funds were utilized to pay any suppliers on the Green Market Project. The Court is satisfied that there is ample evidence in the record to support a finding of defalcation by Paul within the meaning of § 523(a)(4).

## NON–DISCHARGEABLE DAMAGES

■ The non-dischargeable portion of the debt (or measure of damages resulting from the defalcation) consists of that portion directly attributable to Paul's diversion of the funds. Under general principles as to damages, an injured party is entitled to recover in a tort action such damages as result directly, naturally and proximately from the fraud. *Zingale v. Mills Novelty Co.*, 244 Wis. 144, 11 N.W.2d 644 (1943); 37 Am.Jur.2d, § 343, *Fraud and Deceit.* While these citations as well as other citations bearing upon this issue arise in the area of fraud, it appears appropriate and consistent to extend the same reasoning to cases involving defalcation.

Applying the foregoing principles, those obligations of Paul which Lorenz was required to satisfy by payment to Paul's unpaid suppliers on this project are non-dischargeable. They consist of an unpaid bill to Neenah Foundry Company for tree grates in the sum of $2,162.56 and an obligation to Hamele Recreation Company for waste receptacles and accessories in the sum of $495.87. In addition, Lorenz incurred various labor and material costs required to complete the Green Market Project, as well as damages for time and effort in processing unpaid bills and in ordering supplies to complete the job. The Court is of the opinion that these are dischargeable damages resulting from a breach of contract. The purpose of the Wisconsin "theft by contractor" statutes, as previously stated in this decision, is to protect laborers, materialmen and sub-contractors who have performed but have not been paid, as well as property owners against liens being placed upon their properties. A close reading of Wis.Stats. 779.16 leads to the conclusion that it is limited to claims incurred before the fiduciary has ceased operations and should not be extended to new claims arising thereafter and which were created without relation to Paul's defalcation. *Danns v. Household Finance Corp., supra,* holds that only that portion of a creditor's loan which resulted from fraud is non-dischargeable and states, 558 F.2d at 116:

"There is nothing in the legislative history of the 1960 amendments (to the Bankruptcy Act) to indicate a Congressional intent that a bankrupt should be penalized for more than simply the consequences of his fraud".

Furthermore, the Court is once again reminded of the ruling in *Gleason v. Thaw, supra,* which states that courts have previously construed exceptions to discharge against the creditor and in favor of the bankrupt. The Bankruptcy Reform Act of 1978 which has, as a primary purpose, to afford the debtor a "fresh start", strengthens this ruling.

With respect to the retainage of $1,970 being held by Lorenz, this amount should not be credited against the nondischargeable damages resulting from Paul's defalcation. More appropriately, Lorenz is entitled to fully credit this retainage against the

**560**

dischargeable damages resulting from the breach of contract.

In summary, the damages resulting from the Neenah Foundry Company and Hamele Recreation Company obligations and which total $2,658.43 are held to be non-dischargeable.

CONCLUSION

Defendant Paul E. Thomas was a fiduciary within the meaning of § 523(a)(4) of the Code and diverted funds in violation of his fiduciary obligations. As a result, the debt from it to Joseph Lorenz, Inc. is non-dischargeable in the sum of $2,658.43. With respect to the debt from defendant Charlene S. Thomas to Joseph Lorenz, Inc., the full amount is rendered dischargeable.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 752.